# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **JOSE NOEY MARTINEZ** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **-v-** | § | **No.  7:07-cv-00127** |
| | § | |
| **NATHANIEL QUARTERMAN,** | § | |
| **Director, Texas Department of** | § | |
| **Criminal Justice, Institutional Division** § | | **CAPITAL CASE** |
| | § | |
| **Respondent.** | § | |

# PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

## INTRODUCTION

This is Jose Noey Martinez' first federal petition for a writ of habeas corpus

challenging the constitutionality of his conviction and death sentence. Petitioner presents

numerous claim which were raised either on direct appeal or in state habeas proceedings.

In addition, Petitioner presents a claim that he is mentally retarded and ineligible for the

death sentence under *Atkins v. Virginia,* 536 U.S. 304 (2002).  The *Atkins* claim is also

pending in state court.  With this petition, Petitioner is filing a motion to immediately stay

and abate the federal proceedings so that the state court consider the *Atkins* claim.[1]  As

---

[1]The Texas Court of Criminal Appeals has a rule (the modified two-forum rule)  that prevents Texas courts from considering a state habeas application while a federal habeas case related to the same conviction and sentence is pending in federal court unless the federal proceeding is stayed and held in abeyance during the pendency of the

explained in the stay and abate motion and in the statute of limitations section below,

Petitioner is filing this protective petition to ensure that his claims are not subject to a

time bar under 28 U.S. § 2244(a)(1).   In some instances, the claims are presented in

abbreviated form and are not fully briefed.  Documentation of alleged facts in the form of

records and affidavits are referenced, but not attached.  Attorney for Respondent has

agreed that he will not oppose the filing of an amended petition that more fully develops

these claims within 60 days after the conclusion of the pending state court proceedings.

## STATEMENT OF CASE

**A.    Jurisdiction**

This court has subject matter jurisdiction of this case pursuant to 28 U.S.C. §

2241(d).  Petitioner is under a judgment and sentence of death entered in the 370th

Judicial District of Hidalgo  County, Texas.  It is this conviction and death sentence

which Petitioner challenges in this Petition.

**B.    Procedural History**

Petitioner was tried by a jury and convicted of capital murder in the 370th District

Court of Hidalgo County, Texas in November 1996..  Pursuant to the jury's answers to

the special issues set forth in Sections 2(b) and 2(e) of  TEX. CODE CRIM. PROC. art.

37.071, the trial judge sentenced him to death.   On June 30, 1999, the Court of Criminal

Appeals affirmed the conviction and death sentence in *Martinez  v. State*, No. 72,704

---

state court proceedings. *Ex parte Soffar,* No. 29,890 (Tex. Crim. App. - Feb. 11, 2004),

(Tex.Crim.App. June 3, 1999 ). Petitioner did not seek a writ of certiorari.

Petitioner filed his first application for writ of habeas corpus on February 17, 1999 while the direct appeal was pending.  On January 29, 2004, the trial court entered findings of fact and conclusions of law, recommending that relief be denied and transferred the case to the Texas Court of Criminal Appeals (hereafter "TCCA") in accordance with state law.  Thereafter, the TCCA issued an order remanding  the case to the trial court for an evidentiary hearing on Petitioner's claims of ineffective assistance of counsel.

On August 13, 2004, the trial court heard the testimony of Petitioner's trial attorneys and permitted Petitioner to present additional affidavits concerning his ineffective assistance claims.  Following the hearing, the trial court issued supplemental findings of fact and conclusions of law, again recommending that relief be denied.   Order Containing Findings of Fact, Conclusions of Law and Recommendation, December 16, 2004.  On June 28, 2006, the CCA denied relief in *Ex parte Martinez*, 195 S.W.3d 713 (Tex. Crim. App. 2006).

On May 20, 2007, this court appointed undersigned counsel to represent Petitioner in federal habeas proceedings.  In the course of preparing Petitioner' federal petition, counsel found substantial evidence that Petitioner is mentally retarded and therefore not eligible for execution under *Atkins v. Virginia,* 536 U.S. 304 (2002). The claim had not been presented to the state courts.  On June 20, 2007, undersigned counsel, acting *pro bono* on behalf of Petitioner, filed a second state habeas application in the 370th Judicial

District Court of Hidalgo County, Texas, raising a claim under *Atkins*.[2]  That application is pending.

## C.    Statute of Limitations

Section 2244(d) of Title 28, United States Code, imposes a one year statute of limitations on the filing of federal habeas petitions by state prisoners.  Under the limitations provision applicable to most claims, the year runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."  28 U.S.C. § 2244(d)(1)(A).  As used in this provision, direct review includes certiorari review by the Supreme Court.

The limitations period for claims based on a "newly recognized" constitutional right made retroactive to cases on collateral review runs from the date the Supreme Court first recognized the right.  28 U.S.C. § 2244(d)(1)(C).  Under the tolling provision, "[t]he time during which a properly filed application for State post- conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."  28 U.S.C. § 2244(d)(2).

Petitioner filed his first state habeas application while the direct appeal was still pending.  Thus, when Mr. Martinez' conviction became final,  the statute of limitations was immediately tolled with respect all claims raised on direct appeal and in state habeas.

---

[2]Because of the imminent expiration of the limitations period, undersigned counsel prepared and filed the state application for Petitioner *pro bono*.   A  request for appointment of counsel was filed along with the application.

The state habeas application was still pending when *Atkins* was decided, and thus, the limitations period for the *Atkins* claim was likewise tolled.   28 U.S.C. § 2244(d)(2). That tolling ceased on June 28, 2006, when the Court of Criminal Appeals denied the state habeas application, with the full year remaining.

On June 20, 2007, Petitioner filed his successor state application raising his *Atkins* claim.  It is Petitioner' position that under a clear reading of § 2244(d)(2), the June 20, 2007 state court filing tolled the limitations period for all of his claims. *See Villegas v. Johnson*, 184 F.3d 467 (5th Cir. 1999) (the pendency of a successive state habeas application tolls the running of the statute of limitations for the federal habeas petition). Nevertheless, Petitioner is filing this protective petition because opposing counsel would not state Respondent's position concerning the tolling effect of the pending state proceeding until a federal petition was actually filed, and he indicated to undersigned counsel that Respondent might assert an untimeliness bar unless Petitioner filed his petition no later than June 28, 2007.

**D.     Exhaustion**

Petitioner's penalty phase ineffective assistance of counsel claim was raised in his first state habeas application.  The *Atkins* claim is pending is state court.  The remaining claims were raised on direct appeal.

**E.     The Trial - Guilt/Innocence Phase**

On February 19, 1995, Mr. Martinez (also referred to herein as "Noey") who was

5

barely 18 years old at the time, was charged in a single, multiple-count indictment with capital murder of Esperanza Palomo, an elderly woman, and her granddaughter, Amanda Palomol, under six years old, which occurred in Hidalgo County, Texas on the night of February 18 or in early morning hours of February 19, 1995.[3] Both victims received multiple stab wounds, but each died from a single wound. [RR 34:391-397; 411, 413, 419-425, 437-438].  A post-mortem serological examination indicated Esperanza had fresh spermatozoa in her vagina, but there was no evidence of any spermatozoa in Amanda. [RR 34:426-428, 439] The bodies were found by the parents of Amanda Palomol when they returned to the home around 2:00 a.m.

Later in early morning hours, the Hidalgo County Sheriff's Department received a phone call from Noey's father, Jose Angel Martinez (hereafter Angel Martinez), who reported his son had just confessed to a burglary and stabbing.  He informed the officers sent to investigate that his son had arrived at his house earlier that morning and confessed to him about committing a burglary and two murders. [RR 36:697, 706-708].  Angel Martinez gave the officers Noey's description and the clothes he was wearing when he arrived at Martinez's house.  RR 36:707.  At trial Angel Martinez testified that Noey was clearly under the influence of drugs or alcohol.  [37 RR. 930, 944-945].

Roberto Galvan, Noey's cousin testified at trial that he and Noey had been out

---

[3] The indictment charges Mr. Martinez caused the death of two persons, Esperanza and Amanda Palomo, in the same criminal episode, caused the death of Esperanza Palomo in the course of committing burglary of a habitation, caused the death of Amanda Palomo in the course of committing burglary of a habitation, caused the death of Esperanza Palomo in the course of committing aggravated sexual assault, and cause the death of Amanda Palomo, a child under six years of age. [Clerk's Record ____].

earlier that evening. [RR 36:729-730].  They purchased some "roach" pills with a third friend and ingested some of the pills. [RR 36:744-745, 788].  Around 12:00 a.m., Galvan let Noey off in front of Noey's  grandmother's house (which was across the street from the Palomo residence). [RR 36:748].  About an hour later, Galvan returned to look for him.  Noey suddenly came up to Galvan's truck and stated "I – I killed her.  I killed her." [36 RR 755].  They picked up two girls, Michelle Foley and Michelle Burbois, and drove around for a while. [36 RR 756].  While driving in Galvan's truck, Petitioner repeatedly said he had "killed her." [36 RR. 758].   Galvan described Petitioner as "tripping" and "freaking out" during this time. [36 RR 755, 765, 769, 785 ].  Galvan estimated he dropped Petitioner back off at his grandmother's house around 3:00 a.m.  [36 RR 766].

The state called other witnesses who had been with Noey around the same period of time and who testified that he had said seemed "crazy" and "high" and that he said things like he couldn't believe he had killed those people;  that he killed a man and a women during a burglary, that he had hurt a man and a woman, that he had to hide the evidence.  He was described as rocking back and forth; he said he had taken 8 "roach" pills; [37 RR 847]; he was "incoherent," "in a daze;" he spoke incoherently and appeared to be worried because his mother was going to be angry with him. [RR 37:864]

George Ramos, an officer in the Hidalgo County Sheriff's Department transported Noey to the Sheriff's department following his arrest.  Noey stated to Ramos in the car that he "really fucked up this time" and "want[ed] to tell [Ramos] everything, because

this time [he] really fucked up." [39 RR. 1061-1063].  Noey made an oral statement at the Sheriff's Department in which he admitted to killing both decedents.  Ramos wrote down the statement, and Mr. Martinez signed it.  [39 RR 1085-1086].  Two days after Mr. Martinez made his oral statement, Ramos presented a typed version of the statement and Mr. Martinez signed it too.  [40 RR 1152-1158, 1160].  Both of the statements were admitted at trial. [State's Exhibits (SX) 247 & 248.

The State also introduced testimony concerning hair samples, blood typing and DNA evidence that connected Noey with the offense.

The jury convicted Noey of capital murder.

## F.    Trial - Penalty Phase

At the punishment phase of trial, the State presented victim impact evidence from several family members.  The State also produced evidence that Noey and another inmate in the county jail, while awaiting trial for capital murder, wrote a letter to the President of the United States in which they stated their desire to kill the President and the Vice President, as well as sexually assault the President's wife and daughter.  Juan Landa, a Secret Service agent assigned to investigate the case testified he interviewed the petitioner in the county jail and that he re-affirmed the threats made in the letter.  On cross-examination the agent testified that after his investigation he concluded that this was a prank designed to get the prisoners transferred to a federal facility with better conditions.

During the defense penalty phase case-in-chief, trial counsel called two witnesses,

Noey's mother, Alma Martinez (hereafter Alma), and younger brother, Bryan Michael Martinez (hereafter Michael).  Alma testified that Noey grew up in poverty and that for a five year period, she had abandoned Noey and his brother Michael.  During this time, Noey and his brother lived with their grandparents, where they were frequently  beaten by their grandfather. [44 RR 100-115].  Michael testified that when Alma abandoned Noey and himself, they lived with their grandparents.  The conditions living with their grandparents were terrible and the boys were frequently beaten. [44 RR. 126].

Without objection, the state cross-examined Alma about how she would feel if her mother and child were murdered and whether she would want the person who did it punished. At the conclusion of her testimony she broke down and screamed out "why did you do it, Noey"

The jury returned an affirmative answer to the future dangerousness punishment issue and a negative answer to the mitigation punishment issue.  The trial court accordingly sentenced Mr. Martinez to death.

# CLAIMS FOR RELIEF

## CLAIM I.

**Mr. Martinez Was Deprived of His Sixth Amendment Right to Effective Assistance of Counsel When His Trial Attorneys Failed to (A) Conduct a Reasonable Penalty Phase Investigation,   (2) Present Readily Available Mitigating Evidence and (3)  Adequately Prepare for the Penalty Phase of His Trial.  *Strickland V. Washington*, 466 U.s. 668 (1984); *Wiggins V. Smith*, 539 U.s. 510 (2003).**

**A.     Relevant Facts**

(1)   Trial counsel did not conduct a reasonable penalty phase investigation.

There were clear indications and readily available evidence that Noey Martinez had a horrific childhood; that he was verbally, emotionally, physically and sexually abused by his parents and verbally, emotionally, and physically abused by his grandparents.  He was shuttled from one place of abuse to another throughout his life and never shown any love and affection, except by the one person who shared the same fate – his brother Michael.  There were equally clear indications that Noey suffered significant intellectual impairment that rendered him far less able to cope with the deprivation he suffered as a child than a person with normal abilities.

In addition to the readily apparent indicators of both physical and sexual abuse, the State's evidence clearly suggested that Noey was severely impaired at the time of the offense as a result of drug and alcohol intoxication.

Trial counsel did not conduct a reasonable investigation of any of this potentially

mitigating evidence.  Neither trial counsel nor his investigator obtained a life history from

Noey or any of his relatives, and they did not retain a mitigation specialist.  Trial

counsel's penalty phase investigation consisted of only one in-person interview of Noey's

mother (his primary abuser) and most recent step-father and a brief conversation with

Noey's brother, Bryan Michael Martinez, at the courthouse on the same day he was called

as a witness, and possibly a brief group interview with some unnamed relatives who lived

in the Valley who didn't know much about Noey.  In essence, the investigation of Noey's

life history and family background was limited to a short, and not very probing interview

with Noey's abusive and dysfunctional mother and a brief conversation with Noey's

brother just before he testified.  Counsel made no real effort to interview people who were

not only  willing, but wanting to talk to him, including Noey's grandmother, Frances

Reyes, material aunts and uncles, a step-brother who had written counsel a letter and

wanted to talk to him, and foster parents who rescued Noey when his mother kicked him

out.  And counsel's "interview" of the person closest to Noey, his brother and lifeline,

Michael, was relegated to a brief conversation at the courthouse just before he testified.

　　　With respect to Noey's drug use and intoxicated condition on the night of the

offense, counsel's inquiry was cursory at best and did not attempt to develop evidence

concerning Noey's incoherent, confused and intoxicated state of mind or the harmful

side-effects of the drug which he had abused that night.

　　　If counsel had made reasonable inquiries of Noey and any relatives or foster

parents who were around him during his childhood years, they would have discovered

evidence of horrible abuse and neglect.  Even a brief consultation with someone versed in sexual abuse would have alerted counsel to indicators that such abuse was present.  An initial inquiry of persons who might know of it's existence, e.g. Noey's grandmother, his material aunts, his brother, would have lead counsel to witnesses who would have provided information about Noey's mother's history of inappropriate sexual conduct, and in turn lead to the discovery of the critical evidence of sexual abuse in addition to the years of physical, and psychological abuse.

(2)   Noey's life history would have provided substantial mitigating evidence.

A reasonable attempt to obtain Noey's life history would have readily uncovered important mitigating evidence.

(a)  Jose Noey Martinez

(i)   Birth - 4 years old

Noey was born on December 31, 1976, in Weslaco, Texas.  His 17 hear old mother, Alma Martinez (hereafter called Mrs. Martinez), and his father, Jose Angel Martinez, III (hereafter called Angel Martinez) were living in Mission, Texas.  During the next 3 years, his parents had two more sons – Bryan Michael (called "Michael"), who is 1 ½ years younger than Noey, and Reuben who is about 3 years younger.  Angel Martinez physically abused his wife and also severely abused Noey and Michael.  In December 1979, while Reuben was still a baby, Noey's parents divorced, and Mrs. Martinez moved into a low income housing project in Mission with her three sons.  The physical abuse of Mrs. Martinez continued after their divorce and within a few months, Mrs. Martinez took

12

her three children to Houston to live with her mother, Frances Reyes (hereafter called Mrs. Reyes), and her step-father, Felipe Reyes (hereafter called Mr. Reyes), SF Vol 34, p. 101-103.

(ii)    <u>Abandoned at age 4</u>

When Mrs. Martinez and her children first moved in with her mother they lived in a storage building next the Reyes' house.  The building had no plumbing or running water or kitchen.   When they needed to use the bathroom, they had to go to the Reyes' house, which was already overcrowded with the Reyes' six children and only 1 bath.  At night they used a bucket.  During this time, Mrs. Martinez was very abusive of Noey and Michael.  She fondled them in inappropriate ways and was physically abusive.  It appears from Mrs Martinez' history that she had a serious sexual disorder and one of the consequences of that disorder was serious sexual abuse of her children.

After Mrs. Martinez and her sons had been in Houston a few months, Mrs. Martinez left in the middle of the night, abandoning Noey and Michael, and taking her youngest son Reuben.  Mr. Reyes heard Noey and Bryan screaming and crying next door.  They were so upset they could not talk; they could not stop crying.  Bryan still remembers that day: "Noey  woke me up one morning, crying hysterically, and told me our mom had just taken Reuben and left."  Bryan Michael Martinez.

The Reyes' had no choice but to move the boys into their already crowded home making a total of two adults and 8 children.  They did not see or hear from their  mother for five years.

13

(iii)    Five years of Severe Abuse By Grandparents

The Reyes were under a lot of pressure and stress from the overcrowding and financial difficulties, and they took it out on Noey and Michael.  Francesca Reyes; Francisco Frenchy Reyes.  Mr. and Mr. Reyes argued daily, often about having to take care of Noey and Michael.  Mr. Reyes did not want the boys living with them and often, in their presence, he said they should be turned over to CPS (Child Protective Services). *Id*.  The family did become involved with CPS, but not at their request.  The abuse was discovered by a teacher at school, and she reported it to a counselor who reported it to CPS.  For several years after that, CPS was involved with the family.[4]

According to Michael, they were beaten almost daily when living with their grandparents. Mr. Reyes "beat [them] for any little thing."  Byran Michael Martinez. One of the Reyes' daughters, Francesca Frenchy Reyes has described the frequent abuse her parents inflicted their own children as well as Noey and Michael:

> While we were growing up, our parents would discipline us physically.  My father would usually use a belt when he hit us.  When my mother hit us, she would use whatever she could get her hands on, usually a stick from the tree, but also hangers and extension cords.  When we were hit, we were usually struck on the bottom, but sometime my mom would miss and hit us on the legs or back. The hits often cause bruises and I remember at least one time when we had to wear pants in order to cover up bruises when we went to school.  The sticks would also sometimes leave other marks, as well as splinters.  Both Noey and Michael  were struck in this manner.  I do remember one time when my mother was beating Noey with a stick and the stick broke, cutting Noey.

---

[4]During state habeas proceedings, Petitioner's attorney attempted to obtain the CPS records but learned they had been destroyed.

Francesca Frenchy Reyes.  As Mrs. Reyes has acknowledged, during the five years Noey and Michael lived with them, they did not received any love from anywhere.

Mr. Reyes was verbally abusive as well as physically abusive.  Noey had serious difficulties with school work and Mr. Reyes often called him "stupid" and punished severely whenever he brought home a report card.

(iv)   <u>Physically, Sexually, and Verbally Abused by Mother</u>

After having been gone around five years, Mrs. Martinez showed up one day with Reuben and two little girls.  Within a short time, she left and again "dumped" her children with the Reyeses, making eleven in the household.  Mrs. Reyes found out where she was working, went to her and told her she had to take her children back, but Mrs. Martinez refused to take them.  Francesca Reyes.  The little girls eventually went to live with their father and Mrs. Reyes took the boys children to their mother's home and left them. Unfortunately, Noey's and Michael's treatment and care by his mother was far worse than it had been with their grandparents.  According to Michael:

> [O]ur mother beat both of us constantly – she hit us on a daily basis.  When beating us, she would use her fists, bats, boards, basically whatever she could get her hands on.  I recall that on one occasion she beat Noey on the head with a radio over and over until he was bleeding.  The beatings often left us with bruises and whelps, sometimes bloody.  She never apologized for the beatings, would just walk away.

Bryan Michael Martinez.

They were exposed to her drug use:

> Our mother used drugs in front of us.  When she was home, she always seemed to do a lot of cocaine.  Sometime she would use it in front of us and

> other times she would take the men she had brought home to the bathroom
> to use it.  We knew it was cocaine because we could hear them sniffing.  I
> recall that our mother would also go out a lot at night, leaving Noey, myself
> and Reuben at home alone. [*Id.*].

And they often did not have enough food or clothes:

> We did not have much food.  I remember that for years all we seemed to eat
> was fried chicken and donuts.  Since our mother worked at a donut shop,
> she would bring the donuts home for us.  We also didn't have much
> clothing. [*Id.*]

Throughout the time they lived with their mother, she was "constantly" kicking Noey and

Michael "out of the streets to fend for [them]selves." *Id*.  When she tired of having them,

she put them on a bus and sent them to the Valley to say with paternal relatives.

Mrs. Martinez  exposed the children to her promiscuous sexual life.  At one time,

they lived in a single room apartment and the only furniture they had was a sofa and a

mattress.  Mrs. Martinez would have men over and have sex in front of her children.

Sometimes she would either tell them turn their heads and other times she would send

them outside.   Mrs. Martinez also forced her sons to participate in sexual activity with

her and if they refused she would beat them.

Mrs.  Martinez also verbally abused her children.  She yelled at them all of the

time and told Noey and Michael that she hated them, that she didn't want to care for

them, and that they were stupid and would never amount to anything.  Once when

Michael tried to kill himself , she told him that she wished he had.

Noey suffered severe emotional and psychological scars from lifelong  neglect and

abuse, and he gradually turned to drugs.  As he grew older, his drug use increased.

Despite all of this, Noey never got into any serious trouble.  People describe him as

someone who needed love and was always trying to please other people.  He was clingy

and quiet.  When he acted out, he tended to be thought of as a clown.  People who knew

Noey throughout his childhood say that he was never aggressive.

(v)  Foster Homes

During Noey's early teenage years, his mother continued to kick him out on a

regular basis.  As a result, Noey had to live with other people intermittently until his

mother would finally take him back.  At different times, he lived with two foster families

and with paternal relatives in the Valley.  One time he with lived with Mr. and Mrs. Ray

Highfield who knew him from their church.  One day after church, the driver of the

church bus took Noey home, but his mother said that he could not stay there.  Because the

bus driver didn't know where to take him, he asked the Highfields if Noey could stay

with them.  While Noey was with the Highfields, he was always afraid they were going to

send him away.  He would cry about not wanting to go home.

According to Mr. Highfield, Noey lived there for about a month until his mother

wanted him back because she was about to loose her welfare or food stamps.  Later Noey

lived with a couple named Mitchell.  Noey was friends with their twin sons.

(vi)  Paternal Relatives

At various times throughout his childhood, Noey was taken or sent to the Valley

where other relatives lived.  When he went with someone for visits, they were only there

for short periods of time.  After he and Michael were living with their mother, she started

sending them to the Valley to live with their paternal relatives when she tired of having to care for them.  She would take them to the bus station, put them on a bus and someone would meet the bus on the other end.  After being in the Valley a month or so, they would get sent back to their mother.  Noey's drug use increased during the time he was in the Valley, in part because he was exposed to more drugs when he was there. During most of this time his father was in prison and he stayed with paternal aunts and his paternal grandparents.

(vii)  <u>Educational & Intellectual Impairments</u>

Noey had significant problems learning and he suffered from significant intellectual impairments.  His school records document years of poor academic performance from the first grade through the 9th when he stopped attending school at age 17.  Noey's educational records are discussed in detail in connection with his *Atkins* claim. *Infra.*

(2)    A reasonable investigation of the circumstances of the offense would have provided important mitigating evidence.

The crime for which Noey was sentenced to death occurred in February 1995. Noey had turned 18 in December, two months earlier.  At the time, he was staying in Mission, Texas.  Noey's mother had gotten angry with him and sent him to the Valley to be with his father who had just recently gotten out of prison.   Noey's father didn't have much time for him, so he was staying with his maternal aunt, Lisa Martinez and his paternal grandparents.  Lisa's husband's  nephew, Roberto Galvan, was also living there.

18

Roberto's mother was in prison, and he didn't have any place to live; so Lisa and her

husband had taken him in.  On the evening of the murders, Noey had been out with

Roberto.  Roberta obtained and supplied Noey with drugs before the offense.

     All of the people who saw Noey after the offense describe Noey as dazed,

incoherent, confused, and out-of-it.  There was clearly evidence to call into question his

state of mind at the time of the offense.  Counsel failed to consider, pursue and explore

this evidence and it's potential value in mitigation of punishment.

     (3)    There is a reasonable probability that a proper penalty phase investigation
           and proper penalty phase trial preparation would have resulted in a life
           sentence.

     A reasonably adequate investigation would have shed tremendous light on how a

young person like Noey, who was generally non-violent and passive, could have to

committed the terrible offense with which he was charged.   Noey clearly experienced

major physical and psychological trauma throughout  his most vulnerable and

impressionable years and the trauma undoubtedly produced serious psychological

consequences.  Given Noey's young age, this kind of evidence is extremely relevant to a

penalty phase defense of reduced moral culpability.  The paucity of evidence presented as

his sole penalty phase defense did not even begin to scratch the surface.

     Armed with the information from Noey's childhood, reasonably competent

counsel would have explored its psychological consequences and inquired into the extent

to which this kind of trauma made Noey more vulnerable to the dangerous side effects of

the drugs he was taking on the night of the offense.  Information obtained from a

reasonable investigation of Noey's background and the time and circumstances surrounding the offense would have enabled counsel to present a compelling picture of Noey's sad and tragic life and it's consequences that would have enabled the jury to see that he too was a victim and deserving of their compassion and understanding. Information about Noey's horrific childhood, its psychological consequences, and the effects of his extreme intoxication on the night of the offense would have armed counsel with a powerful argument of reduced moral culpability, and likely would have resulted in a life sentence.

## CLAIM II.

### Petitioner Is Mentally Retarded and Ineligible for the Death Sentence under *Atkins v. Virginia,* 536 U.S. 304 (2002)

**A.     The Eighth Amendment Prohibits the Execution of the Mentally Retarded.**

On June 20, 2002, the Supreme Court held that the Eighth Amendment's ban on excessive and cruel and unusual punishments prohibits the execution of individuals with mental retardation.  Reversing its prior decision in *Penry I*, the Court concluded that "the Constitution places a substantive restriction on the State's power to take the life of a mentally retarded offender."  *Atkins v. Virginia*, 536 U.S. 304, 312 (2002) (internal quotation marks omitted).  The Supreme Court rested its conclusion on two grounds.

First, the Supreme Court found persuasive that, at the time of *Penry I* in 1989, only two death penalty states and the federal government had banned the execution of mentally

retarded offenders.  *Id.* at 314.  However, since that time, an additional sixteen states had prohibited the use of the death penalty for the mentally retarded.  The Supreme Court noted that it "is not so much the number of States that is significant, but the consistency of the direction of change."  *Id.* at 315.  These enactments, "[g]iven the well-known popularity of anticrime legislation," provided the Supreme Court with "powerful evidence that today our society views mentally retarded offenders as categorically less culpable than the  average criminal."  *Id.*  In its search for a national consensus, the Supreme Court relied upon the fact that the legislatures passing the laws voted "overwhelmingly in favor of the prohibition."  *Id.*  The Supreme Court also looked to the opinions of social and professional organizations with "germane expertise," such as the American Psychological Association, and the opposition to the practice by "widely diverse religious organizations," international practice, and polling data.  *Id.* at 316 n.21.  While "not dispositive," these factors bolstered the Supreme Court's opinion that a consensus opposing the practice existed "among those that have addressed the issue."  *Id.*  Finally, the Supreme Court noted that even in those states that retained the death penalty for the mentally retarded, only five had actually carried out the execution of a mentally retarded individual since *Penry I*.  *Id.* at 316.  Because the practice had become "truly unusual," it was "fair to say," according to the Supreme Court, that "a national consensus has developed against it."  *Id*.

The second reason the Supreme Court advanced for banning the execution of the mentally retarded was that "this consensus unquestionably reflects widespread judgment

about the relative culpability of mentally retarded offenders and the relationship between mental retardation and the penological purposes served by the death penalty." *Id.* at 317. The Supreme Court noted that, due to their impairments, defendants with mental retardation "have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to control impulses and to understand the reactions of others." *Id.* These deficiencies, the Supreme Court held, while not justifying an exemption from criminal liability, do diminish a mentally retarded person's personal culpability to the extent that neither of the justifications advanced by states in support of the death penalty – retribution and deterrence – would be served by permitting a retarded person's execution. *Id.*

Retribution in the capital context had been limited to ensuring that "only the most deserving of execution are put to death." *Id.* at 319. Because the "just deserts" rationale necessarily depends on the culpability of the offender, the most extreme punishment was deemed excessive due to the "lesser culpability of the mentally retarded offender." *Id.* And, because capital punishment can serve as a deterrent only when a crime is the result of premeditation and deliberation, no deterrence interests are served. *Id.* This type of calculus, the Supreme Court noted, is at the "opposite end of the spectrum" from the behavior of the mentally retarded because of their cognitive and behavioral impairments. *Id.*

The Supreme Court also opined that, due to the impairments of mentally retarded individuals, a host of factors – from the increased risk of false confessions, difficulties in

communicating with counsel, and their lesser ability due to limited communication skill to effectively testify on their own behalf or express remorse – created, "in the aggregate," an unacceptable "risk of wrongful executions" for mentally retarded defendants. *Id.* at 321.  In short, the Supreme Court held that its "independent evaluation of the issue reveals no reasons to disagree with the judgment of the legislatures that have . . . concluded that death is not a suitable punishment for a mentally retarded criminal," and thus the Constitution "places a substantive restriction on the State's power to take the life of a mentally retarded offender." *Id.* (internal quotation marks omitted).

**B.     Definition of Mental Retardation under *Atkins*.**

The American Association on Mental Retardation ("AAMR") defines mental retardation as: (1) subaverage general intellectual functioning (*i.e.*, an IQ of approximately 70 to 75 or below) that exists concurrently with (2) related limitations in two or more adaptive skill areas (communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work), and (3) onset before the age of eighteen.   American Association on Mental Retardation, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 5 (9th ed. 1992) [hereinafter "1992 AAMR Manual"].  The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") employs a definition that is nearly identical to the one set out in the 1992 AAMR

Manual.[5]   In the two decisions that address the constitutionality of executing persons who are mentally retarded, *Atkins* and *Penry*, the Supreme Court expressly relied on these three-prong definitions.   *See Atkins*, 536 U.S. at 309 n.3; *Penry I*, 492 U.S. at 307-09 n.1. In late May 2002, the AAMR released a later version of its manual.  American Association on Mental Retardation, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 1 (10th ed. 2002) [hereinafter "2002 AAMR Manual"].  The three diagnostic criteria are essentially the same as in the earlier version, but the 2002 manual places a greater emphasis on adaptive behavior deficits and describes those deficits in a different way that is more easily understood and applied, classifying adaptive behavior into three major domains, conceptual, social, and practical.

In *Ex parte Briseno*, 135 SW 3d 1 (Tex. Crim. App.2004 ), the Court of Criminal Appeals announced that in the absence of legislature that specifically addresses the issue,it would follow the American Association on Mental Retardation ("AAMR") and

---

[5] The DSM-IV-TR defines mental retardation as follows:

The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A), that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety (Criterion B). The onset must occur before age 18 years (Criterion C).

American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41 (4TH ed., text rev. 2000) ("DSM-IV-TR"); *see Atkins,* 122 S. Ct. at 2245 n.3 (setting out American Psychiatric Association's definition with approval).

the Texas Health and Safety Code definitions prong definition of mental retardation[6].

**C.     Mr. Martinez is Mentally Retarded.**

Credible evidence indicates that Mr. Martinez is mentally retarded:  (1) there is evidence that an IQ test administered before he entered the 8th grade placed him in the category of the mentally retarded with an IQ of 68; and the results of the Cognitive Abilities Test (CogAT) administered when he was in the 8th and 9th grades confirm that he has significant deficits in intellectual functioning; (2) his school records and accounts of his life history by people who knew him from birth to 18 years of age show that he has significant limitations in his adaptive functioning and, (3) the evidence unquestionably shows that these diagnostic features existed before the age of eighteen.

The evidence presented in this application establishes a *prima facie* case of mental retardation.  However, no one has ever conducted a full mental retardation investigation and evaluation. The preparation and filing of Mr. Martinez' first Article 11.071 application took place before *Atkins* was decided.  For this reason, his appointed 11.071 counsel did not pursue  the possibility that Mr. Martinez was mentally retarded nor did he obtain the assistance of experts necessary for a mental retardation evaluation.  On May 20, 2007, undersigned counsel was appointed to represent Mr. Martinez in federal court.[7]

---

[6]Under the Texas Health and Safety Code, Section 591.003(13) "'mental retardation' means significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period."

[7]*Martinez v. Quartermam,* No. M-07-29, Order, USDC SD (May 20, 2007).

At the time, she was virtually unfamiliar with Mr. Martinez's case, and had never met Mr. Martinez or any members of his family.  In the course of preparing the federal habeas petition, counsel became aware of Mr. Martinez' mental impairments and the possibility that he may have mentally retardation.  Upon further investigation, counsel concluded that Mr. Martinez does in fact have a substantial *Atkins* claim.  Since Mr. Martinez is indigent, appointment of counsel and funds for the necessary  investigation and experts are essential to a proper presentation of his *Atkins* claim.  With this application, counsel has filed a motion in the trial court requesting appointment of counsel.  Upon appointment, counsel will prepare and file appropriate funding requests.  In order to preserve Mr. Martinez's claim, counsel has prepared this application *pro bono.*

### 1.    Mr. Martinez' IQ is within the range of the mentally retarded.

The school records which were immediately available to counsel do not include the results of any individually administered IQ tests such at the WISC or Stanford Binet. However, Mary Mendoza, Mr. Martinez' aunt and a social worker at Cuellar Middle School, reports that shortly after she enrolled her nephew in the 8th grade at Cuellar, she was told by a school counselor that he was mentally retarded and that his IQ was below 70.  Mary Mendoza.   The school records do show that the Cognitive Abilities Test (CogAT) was administered on two occasions by the North Shore High School – first when Noey was in the second semester of the 8th grade in April 1992 (CogAt Results), and again during the second semester of the 9th grade in April 1993.  (CogAT Results).

26

The report from the first test does not give a composite score; the composite score from the second test was 71.  A comparison of the two reports show that the subtest scores from the first administration of the test are lower than the subtest scores from the second.

Because counsel was not familiar with the CogAT, she inquired of Dale Watson, Ph.D.[8] about the significance of Mr. Martinez' test results with respect to a mental retardation assessment.  According to Dr. Watson:

> The CogAt is a group administered intellectual abilities test used in schools to assess a student's level of intellectual functioning.  It measures verbal, nonverbal and quantitative abilities.  Comparison studies show that the CogAt composite score has a high correlation to the full scale IQ scores obtained on reliable individually-administered IQ tests such as the *Wechsler* and *Woodcock-Johnson (WJIII) Tests of Cognitive Abilities.*

CogAT Results, Letter from Dale Watson, Ph.D.  Because of this, Dr. Watson also advised counsel that "[a] composite score of *71* on the CogAT is consistent with significant limitations in intellectual functioning and is further consistent with his history of school failure," and he concluded that the score  "mandates a comprehensive evaluation to determine if Mr. Martinez is in fact mentally retarded."  *Id.*[9]

---

[8]Dr. Watson is a clinical and forensic neuropsychologist with substantial training and experience in the area of mental retardation.

[9]Dr. Watson cannot undertake the necessary comprehensive evaluation without funds from the court.  Counsel paid Dr. Watson from her own funds for his limited services in reviewing the testing reflected in Mr. Martinez' school records.

2.    **Jose Noey Martinez's school records and his life history reveal significant limitations in adaptive behavior.**

    **i. Extended Family Relationships**

An understanding of the role and relationship of people who provided information about  Noey's life is important to an appreciation of the depth and breadth of his limitations.  The same limitations appeared consistently throughout his childhood in very different settings and environments.  People who had different relationships and experiences with Noey saw the same disabled child.

Noey lived his first four years in Mission, Texas, with his parents, Jose and Alma Martinez.   There are reports that Jose abused both Alma and the children, many of which were the subject of Mr. Martinez' first Application for Writ of Habeas Corpus.  *See* Application for Writ of Habeas Corpus, No. CR- 0385-95-G(1).  Frances Reyes.  When Noey was about four years old, his parents divorced, and his mother took her three children, Noey, age 4, Michael age 3, Reuben, a baby,  to Houston.  After staying a short time in a small building on her mother's (France Reyes) and step-father's (Felipe Reyes) lot just next to their home, Alma abandoned Noey and Michael to the care of her mother. Without any warning, Alma left in the middle of the night, taking Reuben with her and for five years, no one knew where she was.

From age 4 until he was 9 or 10 years old, Noey and Michael lived with their maternal grandmother and step grandfather and their six children.  During this time, Noey regularly attended grade school one block away. School Records; Frances Reyes.

28

When Alma returned she had Reuben and two little girls who were born while she was away.  Alma and her 5 children lived in the small building next to the main house.  After a short while, Alma left again, leaving all 5 children with her mother.  At some point, Alma got Reuben and the two little girls, but agin left Noey and Michael.  About the time Noey was through the sixth grade, his grandmother, France Reyes, decided she could no longer take care of her daughter's children, and she packed their bags and took them to Alma's apartment.   From that point on, Noey and Michael lived off and on with their mother, sometimes with foster parents, and sometimes with paternal relatives in the Valley.

After trying to locate his brother's children for several years, Raul Martinez, their paternal uncle found them in Houston.  Raul was a truck driver and made frequent trips through Houston, and he would pick Noey and Michael up from time to time and take them to the Valley to visit their other relatives.  At other times, when Alma would tire of taking care of them, she put Noey and Michael on a  bus to Mission, Texas, where they were met by relatives at the other end.   Despite these frequent moves, Noey attended school until he was 17 years old and in the 9th grade for the third time.  School Records.

In 1991,  Noey was in the Valley when school started, staying with his paternal aunt, Mary Mendoza and her family.  Mary, who was a social worker at Cuellar Middle School in Weslaco, enrolled Noey in the 8th grade at Cuellar. Mary Mendoza.  Mary's daughter, Myra, was Noey's age and she had known Noey and Michael for several years

from their visits to the Valley with their uncle, Raul. Myra Mendoza.  On other trips to the Valley, Noey also stayed with his paternal grandparents and another aunt, Lisa, in Mission, Texas.  Lisa Martinez.

### ii.  Long History of Failure in School

Noey's school records document years of poor academic performance from the first grade through the 9th when he stopped attending school at age 17.

### a.  Cloverleaf Elementary School

From 1st grade through 5th grade, Noey attended Cloverleaf Elementary School in Galena Park, a suburb of Houston, Texas.  Records from Cloverleaf show that he entered the first grade in 1983 at age 6.   Noey failed the first grade.  For both semesters of his first year in school, he received U's (unsatisfactory) in math, spelling, and writing.  At the end of the year, he was retained.  Although his grades improved some during his second 1st grade year, they were still poor.  First semester, he received  D's in reading and math, and C's in language, spelling, and writing.  Second semester, he got D's in reading, math and language, and C's in writing, social science and science.  At the end of the year, Noey was "promoted" to the 2nd grade.

In the second and third grade, Noey made mostly C's and D's, and at the end of each year, he was promoted to the next grade.  The school transcript shows that his best grades were in the 4th grade where he was given C's and B's.  However, the following notation appears at the top right hand corner of the Cloverleaf  record:  "4th grade" - "test

for special ed, " and the transcript also show that he was "placed" and not "promoted" in the 5th grade.

In the 5th grade, Noey failed language arts and math and he made D's in science and C's in social studies and fine arts.  He was "placed" (not promoted) in the 6th grade.

### b.  Middle School

During  first semester and the beginning of the second semester of the 6th grade, Noey attended North Shore Middle School in Galena Park.  During a 24 week period he had only 6 excused absences and no unexcused absences.  During this time, he failed all of his classes except PE where he made an A.  According to the school's transfer record, he was identified as "LD" and "ARD" placement was scheduled.  Noey finished the 6th grade at  Edison Middle School, HISD,  where he again failed all of his courses except PE.

For the first semester of the 7th grade, Noey attended Cunningham Middle School and was in "R.R." (remedial) classes.  During the second and third six weeks his grades were higher, which is likely attributable to the lenient grading practices in resource and remedial classes

Noey attended the first six weeks of the 8th grade at Cuellar Middle School in Weslaco, Texas.  His grades were:  Science 55, English 43, Math 60, Reading 74, Social Studies 72 and PE 100.  The transfer records indicate that Noey transferred to Mission ISD, but the records obtained at this point do not include any Mission school records.

31

The only other record for 8th grade does not identify the school. The highest grade he received in that semester (other than in PE) was a C (in Social Studies and Science). The rest of his grades were D's and F's. His grade average for 8th grade was 71 (D) and he was "placed" (not promoted) in the 9th grade.

Noey was in special education classes in the 9th grade and he still failed two years in a row. He stopped attending school during his third year as a 9th grade student.

    iii.    **Mr. Martinez' Life History Reveals Significant Limitations in Adaptive Behavior**

    a. <u>**Grade School Years**</u>

Noey's slow development and lack of achievements outside the classroom parallel his performance in school. Everyone who knew Noey recognized that he was "slow." Frances Reyes, Mary Mendoza, Myra Mendoza, Lisa Martinez, Joanna Deleon. Noey was motivated to go to school and to try to make good grades to avoid severe punishment at home, but he was simply unable to learn. Frances Reyes. Noey's grandfather bought him books hoping it would help him improve in school, but it didn't do any good. Frances Reyes. His grandmother, Frances Reyes, says that Noey was always behind and that "he could not learn." *Id.* The Reyes' had a younger daughter, Francesca, who was 4 years younger than Noey. Francesca "would help [Noey] and try to teach him things." She was "so far ahead of Noey." *Id.*

Noey always had trouble doing things he was told. According to Mrs. Reyes, "It

was like he wasn't all there."  Frances Reyes.

Someone at Noey's school once told Mrs. Reyes that "Noey was like a donkey, he doesn't understand what you say to him."  Frances Reyes.

Noey didn't do a lot of things other kids his age do regularly.  He didn't use the telephone. *Id*.  He couldn't find his way to places.  *Id*.  He always had to be prompted to brush his teeth, take a bath, and wear clean clothes.  *Id*.  His grandmother said that she even had to help him take a bath to be sure that he got clean:

> And then I'd even have to actually scrub him or he would still be dirty
> when he got out of the tub.  After he got older, he would tell me I didn't
> need to do that.  But if I didn't, he would come out with dirt around his
> neck and even on his legs.

Frances Reyes.

Mr. Reyes often became very frustrated with Noey, and would say to his wife:  "I think there is something wrong with them," talking about Noey and Michael, and "I think they are retarded."  "I'll tell them to do something and they don't listen."  Frances Reyes.

Noey was always a follower and didn't know how to resist even the aggression of his much younger bother Reuben.   As Mrs. Reyes describes it:

> Noey was a follower; a teacher told me that he would always follow what
> other children at school did.  Noey didn't know how to take up for himself.
> He was even afraid of his younger brother Reuben.  Reuben would get
> Noey in a corner and he'd be crying and saying that Reuben had hit them.
> Noey didn't know how to defend himself from Reuben even though he was
> several years older.

Frances Reyes.

Noey had very few, if any friends in grade school other than his brother Michael. Frances Reyes; Bryan Michael Martinez.    He did not participate in any activities in school and only played when he was urged to by others.  Frances Reyes.  Noey's failure to participate in normal play activities with other children was in sharp contrast to the behavior of his grandmother's children who also lived in her home.  Mrs. Reyes' children were active in band, baseball, and football, "but Noey was never in anything."  Mr. Reyes put up basketball baskets in the yard for the children, and "[t]he other kids played all the time, but Noey and Michael never played with them."  The only time that Noey would play basketball was when one of Mrs. Reyes older sons, Raul, encouraged him and Michael to go outside with him and play.  *Id.*  Mrs. Reyes said that:

> As long as [Raoul] would be with them they played  with the basketball, but never by themselves.  Felipe also made bars and had slides and swings for the children, but Michael and Noey never played on them.

Frances Reyes.

Raul's wife, Joanna, who at that time was his girlfriend,  also remembers the weekends when Raul wold go to his parents' house and play with Noey and Michael. Joanna recalls that Noey was quiet and reserved and that he tried to do whatever others wanted him to do.  She said that "he was sweet and lovable and he always tried to please people, but he didn't talk very much."  According to Joanna, Michael was a lot more verbal than Noey.  She also remember that Noey never played with children other than Michael.   Joanna Deleon.

34

Noey didn't know how to take care of the few things he had.  Mrs. Reyes says that:

[i]f you gave Noey anything, he usually gave it away or broke it.  Once [she] bought him and Michael some Star Trek figures, and a little boy came over to visit and Noey gave the figures to the little boy.  As he left with it, [Mrs. Reyes] said something to him, and he told [her], "they're mine, he gave them to me."

Frances Reyes.

The Reyes family knew Noey was limited, and they tried to help him, but his limitations continued to frustrate them.  Mrs. Reyes recalls that "Felipe [her husband] would get so upset with Noey and Michel because he wanted them to do things they couldn't do."  Her son,  M.J, would remind him,  "They can't learn."  Mrs. Reyes said that M. J. also  "tried to help Noey" but he concluded that "Noey just couldn't concentrate."  Frances Reyes.

Noey's paternal relatives were not around him for extensive periods of time during his grade school years, but he and Michael did go to the Valley for visits.  Even though these visits were short, his relatives recognized that Noey was much slower and more limited than other children his age.   His cousin, Myra Mendoza, who was his age, recalls that Noey's problems were apparent to her when he visited the Valley as a young child. In her affidavit, Myra recounts two particular incidents that stand out in her memory:

Once when he was visiting in the Valley, he was with me and some other kids, and we all had pop bottles.  Some of the bottles had an indentation on the bottom edge, but Noey's didn't.  Noey wanted his bottle to have an indentation, so he hit it on something, I think it was a stop sign pole.  Of course the bottle broke.

I also remember a time when Noey and Michael were younger and were staying with our grandparents and they were caught hoarding food in their room.  Our grandfather told them that the next time they did that, he was going to make them eat everything they were hoarding.  They did it again, and our grandfather made them eat it all.  Michael got it after being punished once, and he stopped doing it, but Noey didn't.  It took being punished several times before Noey learned and stopped doing it.

Myra Mendoza.

Although Noey's brother Michael also had difficulties learning, the people around them thought that Noey, who was the oldest, was the slower of the two.  Joanna, their uncle Raul's girlfriend and later his wife, says that Noey was not as verbal as Michael.  Lisa Martinez, one of Noey's paternal aunts says that both of Noey and Michael were limited, but even though Michael was younger, he would usually take the lead."  Lisa Martinez.   And despite Michael's limitations, he was aware that Noey had problems doing things people wanted him to do.  Michael remembers how  Noey's limitations sometimes precipitated his mother's abuse of him.  Michael says that their mother was mad at them most of the time, but that it was worse for Noey:

She was always getting mad at him because he didn't do things right.  He'd forget or get it wrong. One time we lived in a house that didn't  have running water, and we used a bucket.  She had told Noey to empty it, and he forgot.  She picked up something and hit him in the head so hard that it knocked him down, and he started shaking and his body was going up and down.

Michael Martinez.

36

### b.  **Middle School Years**

From the time Noey was around 12 or 13 years old, he bounced back and forth between his mother, foster parents, and his paternal relatives in the Valley.  While his dysfunctional family life certainly did not  help his performance in school, it does not account for the limitations that those around him continued to observe.

After Noey and Michael were living with their mother, Mrs. Reyes was driving near their apartment early one morning, on her way to work, and she saw Noey and Michael standing outside on the corner.  They told her that their mother had kicked them out and they had been watching for her:

> They had waited near the corner all night because they knew I drove that way to work.  They couldn't figure out how to call anyone to come get them, so they waited there for me all night.   Noey had to have been at least 12 or 13 at the time.

Frances Reyes.

In the fall of 1991 (Noey was 14 years old) while he was staying in Weslaco with Mary Mendoza' s family, he enrolled in Cuellar Middle School.  Mary recalls that "[he] did not know how to take care of himself."  She explains:

> While he was living with us, I had to remind him to do things like change his socks, bathe and brush his teeth.  If he were left on his own, he wouldn't bathe and he would just wear the same clothes over and over.
>
>  If you asked Noey to do something, he wouldn't know  where to start. When I told him to do things like take out the garbage, I would have to remind him again to do it or he would forget.

Mary Mendoza.

Everyone around Noey recognized that his dependence on others did not diminish as he got older. Myra saw it in school:

> You could tell by the way Noey talked that he didn't have any common sense. He would do whatever the other kids would tell him to do.  He always tried to please other people.  I would tell him he didn't have to do that.  There were times when he would have a little money that my  parents had given him, and the other kids would get it from him.  They would just say, "give me your money," and Noey would just do it and not even question it.

> With other kids, he was always a follower.  When he first started going to school at Weslaco Jr. High, he was the "new kid" and everyone was trying to make friends with him.  When he hung out with the different cliques, he would  follow them around, literally.  He would tag along behind them, literally following them and doing what they did.

Myra Mendoza.

Because Noey wanted to please people around him he was willing to do things when asked, but he had to be told exactly what to do and how to do it.  Once his aunt, Lisa Martinez, wanted him to hang Christmas lights on their house.  First he was scared to get on the roof.  Lisa had to show him "exactly where to put each nail and how to hang the lights."

Noey never got a driver's license.  Lisa Martinez, Michael Martinez..  He never even showed any interest in driving.  Lisa Martinez .  He didn't have an ID.  Martinez.  And he never had a job.  Mary Mendoza, Lisa Martinez, .  Mary Mendoza thinks he didn't even  knew how to go about getting one.  She also can't imagine sending him shopping: "You would have to tell him exactly what to get and how to get it."  Mary

Mendoza.  The only "work" he ever did was mow yards – and just for relatives.  Mary Mendoza and Lisa Martinez.

**D.      The principles guiding the assessment of adaptive behavior.**

The 1992 AAMR Manual and the DSM-IV defined adaptive behavior by focusing on ten specific adaptive skills: communication, self-care, home living, social interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety.  The 2002 AAMR Manual shifts to three broader domains of adaptive behavior: conceptual, social, and practical skills.  The 2002 manual defines adaptive behavior as  the collection of conceptual, social, and practical skills that have been learned by people in order to function in their everyday lives."  2002 AAMR Manual at 73.  The ten skill areas listed in the 1992 AAMR manual and the DSM-IV definitions can be conceptually liked to one or more of the three domains found in the 2002 AAMR definition.  The 2002 manual requires that there be "significant limitations . . . in adaptive behavior . . " AAMR 2002, at 1 and "[s]ignificance" can be established by limitations in one of the three domains.  AAMR 2002, at 74, 77-78.  The 2002 manual provides examples of "representative skills" in each of the three domains.  As the following chart illustrates, Mr. Martinez has "significant" limitations in adaptive behavior as defined in both manuals.

| Adaptive Behavior Skill Areas in 2002 AAMR Definition | Adaptive Behavior Skill Areas in 1992 AAMR Definition | Noey Martinez' Limitations |
| --- | --- | --- |

| Conceptual | Communication | much difficulty in understanding what others said to him;<br><br>did not talk much |
| | Functional Academics | repeated failure in academic learning in school; |
| | Self-direction | unable to understand basic physical properties of objects, such as glass bottles;<br><br>unable to do what he was told or to follow directions;<br><br>poor problem-solving abilities, such as the time when his mother threw him out and he waited all night on a street corner for his grandmother to drive by;<br><br>perceived by everyone as slow;<br><br>inability to learn from experience, even when punished, such as when he hoarded food and was punished for it; |
| Social | Social Skills | a follower – a "tag along," going with others and doing what they did;<br><br>always wanted to please others;<br><br>did not have many friends;<br><br>could not resist others' assertiveness, aggression, demands, or requests;<br><br>often gave his money or possessions away; |
| | Leisure | did not participate in normal play activity |

| Practical | Self-care | did not brush teeth, bathe, or wear clean clothes without prompting; |
| | | did not bathe adequately on his own; |
| | | did not use telephone; |
| | Community use | could not find his way to places; |
| | | did not drive, had no license; |
| | | did not have an I.D.; |
| | | could not shop on own; |
| | Work | never had a job, did not know how to go about getting one |

## CLAIMS III & IV

**Mr. Martinez Was Denied His Right to an Impartial Jury and Due Process of Law under the Sixth and Fourteenth Amendments to the United States Constitution When the Trial Court Denied His Challenges for Cause of Juror Apolinar Ramirez and Juror Armando Garza.** *Morgan V. Illinois*, 504 U.s. 719 (1992).

**Claim III - Denial of Cause Challenge of Juror Ramirez.**

Juror Apolinar Ramirez' answers during voir dire revealed that he was biased in favor of death.  (SF 15 756-767).  He stated that he believed that if a person took a life, the only proper punishment is death.  Juror Ramirez' answers showed that his views about the death penalty would impermissibly interfere with his consideration of mitigating evidence and his ability to follow the law.  Mr. Martinez challenged Juror Ramirez for cause and the trial court denied the challenge.

**Claim IV - Denial of Cause Challenge of Juror Garza.**

Juror Armando Garza stated that he believed the death penalty is the logical choice

41

because it costs to much to keep people imprisoned.  Juror Garza also said that he had a

brother who had been killed.  Juror Garza's answers to counsels' questions during voir

dire revealed impermissible bias and showed that his views about the death penalty would

impermissibly interfere with his consideration of mitigating evidence and his ability to

follow the law.  Mr. Martinez challenged Juror Garza for cause and the trial court denied

the challenge.


The trial court's denial of these challenges deprived Mr. Martinez of a fair and

impartial jury with respect to punishment and violated the Sixth and Fourteenth

Amendments.

## CLAIM V & VI

**Mr. Martinez Was Denied His Right to an Impartial Jury and Due Process of Law under the Sixth and Fourteenth Amendments When the Trial Court Granted the State's Challenges for Cause of Jurors Estefana Rios and Maria Trevino Based on Their Opposition to the Death Penalty.  *Adams V. Texas,* 448 U.s. 38 (1980); *Wither Spoon V. Illinois*, 391 U.s. 510 (1968).**

## CLAIM V - Dismissal of Juror Rios for Cause.

Juror Esteban Rios acknowledged that she was opposed to the death penalty but

stated that she would answer the special issue honestly not withstanding her views about

the death penalty.  The trial court granted the State's cause challenge of Juror Rios over

an objection by Mr. Martinez.  (SF 27:2175-76, 2185, 2186, 2191).

42

**CLAIM VI - Dismissal of Juror Trevino for Cause.**

Juror Maria Trevino was also excused because of her opposition to the death penalty and despite her the fact that she could follow the law and answer the questions honestly, based on the evidence.  (SF 29:2503-2504, 2515-2516, 2527, 2536-2537).

The trial court's dismissal of these jurors pursuant to the State's challenges for cause denied Mr. Martinez a fair and impartial jury with respect to punishment and violated the Sixth and Fourteenth Amendments.

## CLAIM VII

**the Trial Court's Failure to Instruct the Jury That Mr. Martinez Would Not Be Eligible for Parole for 40 Years Violated His Right to Due Process of Law under the Eighth Amendment.  *Simmons V. North Carolina*, 512 U.s. 154 (1994).**

Mr. Martinez requested an instruction concerning the fact that a life sentence constituted a mandatory sentence of 40 years without possibility of parole.  The court denied the request.  The future dangerousness issue was critical to the jury's sentencing decision in this case and the refusal to give that instruction was fundamentally unfair and in violation of the Fourteenth Amendment.

43

## Claim VIII

**the Jury Charge That Voluntary Intoxication Can Not Be a Defense to a Crime, Together with the Court's Failure to Give a Requested Instruction That Voluntary Intoxication Can Provide Evidence That a Defendant Lacked the Requisite Mens Era for a Particular Offense Violated Mr. Martinez' Right to a Fair Trial and Due Process of Law under the Sixth and Fourteenth Amendments.**

There was substantial evidence that, at the time of the offense, Mr. Martinez was intoxicated and drugged to the point of being incoherent, dazed and incapable of forming the specific intent required for capital murder.  The trial court gave a specific instruction to the jury that voluntary intoxication was not a defense.  Defense counsel objected to the instruction and requested an additional instruction that explained to the jury that while evidence of voluntary intoxication was not a defense to a crime in general, it could be used to establish that the defendant did not have the ability to form the specific intent and/or did not possess the specific intent required for a particular offense.  Without the requested instruction, the court's charge mislead the jury to believe that it could not consider the substantial evidence of drug and alcohol intoxication as a defense in any respect.  If the trial court had given the requested instruction, the jury could well have concluded that the extent of Mr. Martinez' intoxication reduced the offense from capital murder to murder.  Without the requested instruction, Mr. Martinez was deprived of a fundamentally fair trial in violation of the Sixth and Fourteenth Amendments.

## CLAIM IX

**Petitioner's Conviction Was Based in Part upon an
Involuntary Confession in Violation of Due Process.**
*Rogers V. Richmond*, 365 U.s. 534 (1961).

There was significant evidence at trial that Petitioner was heavily intoxicated at and around the time he was arrested, to the point that he was incoherent, out-of-it and dazed.  Soon after his arrest, Petitioner gave a confession.  The defense objected to its introduction, raising its involuntariness.   Once the involuntariness of a confession is raised, it is the state's burden to prove voluntariness.  *Jackson v. Denny*, 178 U.S.  368 (1964).  The state failed to meet its burden, and the introduction of the confession violated Petitioner's right to Due Process of Law.

## CLAIM X.

**Petitioner Was Denied His Sixth Amendment Right of
Confrontation When the Trial Court Sustained an
Objection to a Portion of Defense Counsel's Cross-
examination of a Key Witness, Robert Galvan.**

One of the key witnesses against Petitioner was Robert Galvan.   Initially he was a suspect who failed a polygraph, but he was never charged. [RR 36:728-793].  During questioning, the State asked him about his prior arrests.  The Defense sought to go into the prior arrests on cross-examination and the State objected.  The trial court sustained the objection.  The state had opened the door and the defense was entitled to go into the subject in order to rebut the witness's misleading statements about his prior troubles.

## CLAIM XI.

**The Trial Court's Admission of a Letter Purported to Have Been Written by Petitioner Violated Petitioner's Right of Confrontation and Right to Counsel under the Fifth, Sixth and Fourteenth Amendments.**

During the punishment phase, the defense objected to the introduction of a letter Petitioner alledgedly wrote to Present Clinton threatening him and his daughter, along with a report made by the Secret Service concerning their interview with Petitioner. Petitioner was not represented by counsel during the interview and defense counsel on the pending murder charge was not present nor was he notified of the interview.  The state failed to meet its burden of proving that Petitioner waived counsel.

 The letter bore the signature of a second person who was not a witness in the case and not available for cross-examination.

The admission of the letter and the Secret Service report violated Petitioner's right to counsel and his right to confront witnesses in violation of the Fifth, Sixth and Fourteenth Amendments.

## PRAYER FOR RELIEF

Wherefore, JOSE NOEY MARTINEZ prays that this Court:

A.      Order Respondent to provide this court with the record of all state court proceedings;

B.   Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death;

C.   Grant an evidentiary hearing so that he may present evidence in support of these claims; and

D.   Grant such other relief as law and justice require.

Respectfully submitted,

S/Mandy Welch

MANDY WELCH
TBA No. 21125380
412 Main Street, Suite 1100
Houston, Texas 77002
Tel. (713) 516-5229
Fax (713) 893-2500
mandy@burrandwelch.com
ATTORNEY FOR JOSE NOEY
MARTINEZ

## VERIFICATION


Under penalty of perjury, I hereby declare that I have read the foregoing Petition, and to the best of my knowledge and belief all the allegations made herein are true and correct.

Dated: June 28, 2007                              S/Mandy Welch_____
                                                 MANDY WELCH

## CERTIFICATE OF SERVICE

This is to certify that a copy of this pleading was served on opposing counsel, Baxter Morgan, Assistant Attorney General, by electronic filing on June 28, 2007.

S/Mandy Welch

_____

MANDY WELCH